**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| BRENDON A. CATE, | ) | |
| | ) | |
| Plaintiff, | ) | Docket No. _____ |
| v. | ) | |
| | ) | |
| PUBLIC SERVICE ENTERPRISE GROUP, INC. | ) | **COMPLAINT FOR DAMAGES** |
| and AEROTEK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES, the Plaintiff, Brendon A. Cate, and complains against the Defendants as follows:

**I.**
**INTRODUCTION**

1.      This action for damages arises out of the wrongful termination of plaintiff, Brendon A. Cate by the defendants based on a faulty allegation of sexual harassment. The defendants failed to inform and put Mr. Cate on notice of the employment policies to which he was bound and preceded to terminate him based on these policies without affording Mr. Cate the opportunity to be heard in his defense pursuant to defendant, Public Service Enterprise Group, Inc.'s policy which stated that he was entitled to a full and fair investigation. Plaintiff is requesting lost wages and attorneys' fees as a result of his wrongful termination.

**II.**
**PARTIES**

2.      The plaintiff, Brendon A. Cate, is a natural person whose address is P.O. Box 444, Plymouth, New Hampshire 03264.

3.     On information and belief, the defendant, Aerotek, Inc. ("Aerotek") (formerly Onsite Energy Services, a division of Onsite Energy Companies, Inc.), is a corporation with its principal place of business located at 7301 Parkway Drive, Hanover, Maryland 21076.

4.     On information and belief, the defendant, Public Service Enterprise Group, Inc. ("PSEG"), is a New Jersey corporation with its principal place of business located at 80 Park Plaza, P.O. Box 570, Newark, New Jersey 07101.

## III.
## JURISDICTION AND VENUE

5.     Diversity jurisdiction in this Court is proper in this case under 28 USC § 1332 as the amount in controversy exceeds the sum of $75,000 and is between citizens of different states.

## IV.
## FACTS

6.     Mr. Cate is an honors graduate in Civil Engineering from Northeastern University in Boston, Massachusetts and a Registered Professional Engineer in the State of New Hampshire. He has had a twenty-year history of managing heavy industrial and heavy civil project work in the Lower Forty-Eight States and Alaska. *See* Mr. Cate's Resume at Exhibit 1.

7.     Aside from the allegation of sexual harassment which led to the termination at issue in this Complaint, Mr. Cate's professional history has been incident free.

8.     In July 2002, defendant Aerotek (at the time Onsite Energy Services) ("Onsite"), a staffing company, hired Mr. Cate on a temporary basis to be the PSEG Civil Construction Supervisor for Onsite's client defendant, PSEG, an energy company, during construction of PSEG's new power plant, called the Bethlehem Energy Center (BEC) Project, located in Albany, New York.  The PSEG Civil Construction Supervisor is a Senior Level PSEG Field Construction Management position.

2

9.      Onsite furnished Mr. Cate with an Onsite Energy Services Employment Agreement ("Employment Agreement"), which Mr. Cate signed in anticipation of his job as the PSEG Civil Construction Supervisor. *See* Employment Agreement at Exhibit 2. The Employment Agreement stated the following information:

        a.      The employment was subject to final approval by PSEG.

        b.      The employment with Onsite was "at will" and Onsite could terminate Mr. Cate's employment with or without cause at any time.

        c.      Mr. Cate was required to submit time records to Onsite each week that had to first be approved and verified by a PSEG supervisor so that Onsite could obtain payment from PSEG to pay Mr. Cate's paycheck. Mr. Cate's paycheck would not be released unless PSEG approved and verified the time records.

        d.      Onsite paid Mr. Cate's full expenses incident to mobilization to the job site including meals, hotels, and mileage. A PSEG manager had to sign off on these expenses before Mr. Cate could be reimbursed.

        e.      In addition to the rules, regulation, and policies of Onsite, Mr. Cate agreed to be bound by any applicable rules, regulations, or policies established by PSEG.

10.     Mr. Cate began work at the PSEG Albany job site on Monday, July 8, 2002. He planned to commute each week from his home in Plymouth, New Hampshire and stay at a hotel near the job site.

11.     Soon after arriving at the job site, Kevin Reimer and John Cherko, the BEC Project Manager and Project Engineering Manager from PSEG Construction Management, informed Mr. Cate, along with the other employees that pending satisfactory job performance,

the positions would last for **at least** the project's estimated two year construction duration, or about 100 weeks.

12.     Mr. Cate's work weeks usually equaled or exceeded fifty hours per week.

13.     Pursuant to the Employment Agreement, Mr. Cate was to be paid $40.00 per hour and a $490 weekly per diem for all weeks that he reported to the BEC job site for work.  This meant that Mr. Cate would have earned wages roughly amounting to $250,000 for the project.

14.     PSEG supplied all of the equipment necessary for the completion of the job.

15.     Mr. Cate submitted an expense report each week for the first (5) weeks with his corresponding original receipts for his full expenses attached.  During Mr. Cate's third week on the job, Dawn Viele, the PSEG Field Manager, notified him that Cynthia Ross at the PSEG corporate headquarters in Newark, New Jersey had requested Mr. Cate's original receipts, which he had already been submitting with his weekly expense reports.

16.     During Mr. Cate's fifth week on the job, he received a direct e-mail communication from Ms. Ross requesting his original expense receipts.  *See* E-mail at Exhibit 3. Upon receiving the e-mail, Mr. Cate immediately called Ms. Ross pursuant to the contact information she had provided in the e-mail to ask what was required, as he had already been attaching his original receipts to his weekly time and expense reports.  During this conversation, it was mutually agreed that immediately following the 5th and final week of Mr. Cate's contractually defined full expenses, all original receipt information, copies, or otherwise would be submitted to Ms. Ross in Newark, NJ as one original receipts package.

17.     Once the original receipts package had been sent by overnight mail to Ms. Ross, Mr. Cate called Ms. Ross to inform her that the subject materials had been sent.  Mr. Cate called

Ms. Ross again to ask if she had received it.  Ms Ross confirmed the receipt of the original receipts package and thanked Mr. Cate.

18.     During Mr. Cate's seventh week on the job, the week after he sent the original receipts package to Ms. Ross in New Jersey, he had a chance meeting with her in the BEC Field Office at the BEC job site in Albany, New York, his full time field based work location.  The interaction between Mr. Cate and Ms. Ross lasted less than five minutes, consisted of introductions and a comment regarding the original receipts package, and was conducted completely in the presence of Brian Van Aken, the Account Manager from the Onsite Branch Office in Piscataway, New Jersey, who was responsible for the Onsite personnel at the PSEG/BEC job site.

19.     The eighth and last week on the job, when Mr. Cate submitted his weekly Time & Expense Report, he thought of Ms. Ross as a result of the original receipts controversy surrounding his first five weeks of Expense Reports and decided, as a professional courtesy, to e-mail her architect's renderings of the before and after BEC Power Plant construction so that Ms. Ross might better understand what she had observed when she had visited the BEC job site the week before.

20.     On Friday, August 30, 2002, Mr. Cate's last day on the BEC job site pending a pre-approved leave of absence for the upcoming Labor Day Holiday Week, he realized that the architect's renderings he had sent to Ms. Ross earlier that week had not been compressed, and probably caused Ms. Ross's PSEG/LAN e-mailbox to become overloaded.  Mr. Cate planned to call Ms. Ross that day to apologize, but became too busy.

21.     Mr. Cate planned to address the situation from his home in Plymouth, New Hampshire during his time off over the Labor Day holiday week.

22.     On Monday, September 2, 2002, Mr. Cate e-mailed Ms. Ross from his home in New Hampshire apologizing for clogging her "mailbox"…her PSEG LAN e-mailbox with the construction "pictures"….the before and after architect's renderings.  *See* E-mail at Exhibit 4.

23.     As this was an apology e-mail, Mr. Cate began with the reverent salutation "My Dear Cynthia."  He proceeded to apologize for the large size of the "two pictures/files" which he had e-mailed to her and asked her if she would accept the attached (and compressed) "BEC Job PhotoShoot" as a "sign of friendship."  He then stated, "you are a friend, right?" which Mr. Cate figured Ms. Ross would take as meaning "no hard feelings, right?"  Mr. Cate next stated "I'm home this week so don't be bashful", then listed his New Hampshire contact information.  By saying this, Mr. Cate meant to confer to Ms. Ross that as he was in New Hampshire and not at the BEC Job Site in Albany, NY, so his contact information would be different and that she should not hesitate to contact him in New Hampshire if necessary.

24.     As Mr. Cate's home in New Hampshire is over 300 miles North of Newark, New Jersey, where Ms. Ross worked at the PSEG corporate headquarters, it would have been unreasonable for any person to interpret Mr. Cate's last statement in his e-mail as an" invitation" to Ms. Ross to visit him in New Hampshire.

25.     On Wednesday, September 4, 2002, Brian Van Aken called Mr. Cate to inform him that Ms. Ross had "taken issue" with the context/content of Mr. Cate's e-mail of Monday, September 2, 2002.  However, Van Aken told Mr. Cate that he had spoken with Ms. Ross moments before he called Mr. Cate, and Van Aken and Ms. Ross had come to the conclusion that the situation had been a "misunderstanding."  Further, according to Mr. Cate, Van Aken stated that Ms. Ross had been an employee of PSEG for only six months and had already made

complaints of sexual harassment against two male employees at the PSEG corporate headquarters.

26.    Van Aken informed Mr. Cate that he would be meeting with the PSEG Human Resources Department ("HR") in Newark the next day to reconcile the "misunderstanding" between Mr. Cate and Ms. Ross.

27.    On Thursday, September 5, 2002, Mr. Cate came home to an answering message from a distraught Van Aken requesting Mr. Cate to call him immediately.  Mr. Cate called Van Aken who stated "I can't believe it, everything just got out of hand; they [PSEG] want you off the job site effective immediately.  She [Ms. Ross] never wanted that!"  During this conversation Van Aken reminded Mr. Cate that pursuant to the Employment Agreement, Mr. Cate could be terminated with or without cause at any time.  Also, at Mr. Cate's request, Van Aken promised to forward a summary of the preceding 2 ½ days events, inclusive of the closed door PSEG termination proceedings, to Mr. Cate via a formal Termination Letter.

28.    PSEG terminated Mr. Cate for allegedly sexually harassing Ms. Ross without consulting Mr. Cate or an authorized representative.

29.    On Tuesday, September 10, 2002, Van Aken sent Mr. Cate a formal Termination Letter from Onsite which stated that pursuant to PSEG's "Zero Tolerance" policy, Mr. Cate was being terminated from the BEC Project in Albany, NY, effective Thursday, September 5th via the telephone conversation with Brian Van Aken that same day.  Van Aken did not include the promised summary of the proceedings at PSEG surrounding this matter.  Further, the letter was devoid of any mention of the alleged sexual harassment claim.  *See* Termination Letter at Exhibit 5.

30.     PSEG terminated Mr. Cate pursuant to a "Zero Tolerance" policy that Mr. Cate had never read, seen, or been informed about prior to this incident, even though it stated in Mr. Cate's Employment Agreement that he agreed to be bound by PSEG's policies.

31.     According to the Introduction and Section 27.0 of PSEG's Standard's of Integrity ("Standards") which can be found on PSEG's website (www.pseg.com) and set the expectations for employees and contract workers of PSEG, PSEG contractors *are responsible* for ensuring that the Standards are communicated to and understood by the contract employees that are hired to do work for PSEG.  PSEG contractors such as Onsite, are required to incorporate in their Employment Agreements with the contract employees, a provision stating that they will comply with PSEG's policies.  *See* Standards of Integrity at Exhibit 6.

32.     In the Conclusion of the Standards, PSEG states that "compliance [with the Standards] is a condition of employment."

33.     The Standards further state in Section 10.0 that sexual harassment, whether quid pro quo or which creates a hostile work environment, is prohibited and will not be tolerated.

34.     In addition, PSEG states in Section 4.0 of the Standards that it will conduct a prompt, *full, fair investigation* of all reports alleging violations of the Standards.  Further, it states that a PSEG Ethics Counselor will prepare a report documenting the results of these investigations.

35.     Van Aken confirmed via e-mail to Mr. Cate dated December 10, 2002, that Mr. Cate, "never signed or read any document from PSEG describing their "Zero Tolerance" policy." Van Aken stated however, that Mr. Cate "implied consent" to these policies, which he never even read or heard about, by signing the Employment Agreement and promising to abide by them.  *See* E-mail at Exhibit 7.

36.     It took Mr. Cate approximately two years after his termination from the PSEG/BEC job site to find an employer that would hire him, a fact which he believes is a consequence of his wrongful discharge from PSEG that was based on a faulty allegation of sexual harassment.

## COUNT I
## WRONGFUL TERMINATION:  BREACH OF CONTRACT

37.     The allegations of paragraphs 1 through 36 are incorporated herein by reference.

38.     In signing his employment contract, Mr. Cate agreed to be bound by the applicable rules, regulations, and policies established by PSEG.

39.     PSEG's investigation policy clearly states that PSEG will conduct a full and fair investigation of all reports alleging violations of its policies.

40.     PSEG cannot be said to have conducted a full and fair investigation of Ms. Ross's claim alleging sexual harassment against Mr. Cate as it terminated Mr. Cate without ever discussing Ms. Ross's claims with him or any duly authorized representative of Mr. Cate.

41.     As a result of this breach of contract, Mr. Cate has suffered lost wages from his premature dismissal from the PSEG/BEC job site and from his inability to find work for approximately two years, despite his civil engineering degree, professional engineering licensure and twenty years of experience managing heavy industrial and civil project work.  In addition, Mr. Cate is entitled to attorneys' fees as a result of contesting this wrongful termination.

## COUNT II
## WRONGFUL TERMINATION:  INADEQUATE INVESTIGATION

42.     The allegations of paragraphs 1 through 41 are incorporated herein by reference.

43.     PSEG's policies state that sexual harassment, whether quid pro quo or that which creates a hostile work environment, is prohibited and will not be tolerated.

44.     Mr. Cate's minimal and benign interactions with Ms. Ross certainly did not constitute sexual harassment which could have led to a hostile work environment for Ms. Ross such that she felt that it interfered with her work performance, intimidated her, or made her feel significantly offended.

45.     Further, Mr. Cate's interactions with Ms. Ross did not constitute quid pro quo sexual harassment, as he did not have the authority to make an employment decisions based upon Ms. Ross's submission or rejection to her alleged claims of sexual harassment.

46.     Mr. Cate's actions did not rise to the level necessary for him to have violated the PSEG's policies, to which he was bound.

47.     An adequate investigation by PSEG, pursuant to its policy that states it will conduct a full and fair investigation of all reports alleging violations of its policies, which should have included hearing Mr. Cate's side of the story, would have revealed that he was not guilty of violating PSEG's policies and therefore, did not deserve to be terminated.

48.     As a consequence of PSEG's inadequate investigation that resulted in Mr. Cate's wrongful termination, he has suffered lost wages from his premature dismissal from the PSEG/BEC job site and from his inability to find work for approximately two years, despite his civil engineering degree, professional engineering licensure and twenty years of experience managing heavy industrial and civil project work.  In addition, Mr. Cate is entitled to attorneys' fees as a result of contesting this wrongful termination.

## COUNT III
## WRONGFUL TERMINATION:  EXCESSIVE DISCIPLINE

49.     The allegations of paragraphs 1 through 48 are incorporated herein by reference.

50.     PSEG's policies state that sexual harassment, whether quid pro quo or that which creates a hostile work environment, is prohibited and will not be tolerated.

51.     Mr. Cate's minimal and benign interactions with Ms. Ross certainly did not constitute sexual harassment which could have led to a hostile work environment for Ms. Ross such that she felt that it interfered with her work performance, intimidated her, or made her feel significantly offended.

52.     Further, Mr. Cate's interactions with Ms. Ross did not constitute quid pro quo sexual harassment, as he did not have the authority to make employment decisions based upon Ms. Ross's submission or rejection to her alleged claims of sexual harassment.

53.     Therefore, Mr. Cate's actions did not rise to the level necessary for him to have violated the PSEG's policies, to which he was bound.

54.     Further, in Mr. Cate's twenty years of work experience, he has had no prior history of ever sexually harassing a co-worker before this alleged "incident" that PSEG interpreted as fitting its definition of sexual harassment.

55.     In addition, according to Van Aken's conversations with Ms. Ross, the two had come to the conclusion that Ms. Ross had misinterpreted Mr. Cate's e-mail to her and that she never wanted him to be terminated as a result of the e-mail.

56.     The excessiveness of the discipline that PSEG rendered against Mr. Cate is even more severe in light of the fact that he never received notice from PSEG or Onsite regarding the PSEG's "Zero Tolerance" sexual harassment policy, to which he was bound.

57.     Nor did Mr. Cate receive any chance to correct his alleged inappropriate (and arguably ambiguous) actions before PSEG decided it was appropriate to terminate him.

58.     As a consequence of the excessive discipline that PSEG rendered against Mr. Cate that resulted in his wrongful termination, he has suffered lost wages from his premature dismissal from the PSEG/BEC job site and from his inability to find work for approximately two

11

years, despite his civil engineering degree, professional engineering licensure and twenty years of experience managing heavy industrial and civil project work. In addition, Mr. Cate is entitled to attorneys' fees as a result of contesting this wrongful termination.

## COUNT IV
## WRONGFUL TERMINATION: VIOLATION OF PLAINTIFF'S PROCEDURAL DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

59.     The allegations of paragraphs 1 through 58 are incorporated herein by reference.

60.     PSEG is a regulated gas and electric company in New Jersey.

61.     PSEG has deprived Mr. Cate of his reputation, honor and integrity by not affording him the opportunity to controvert the allegations of sexual harassment against him prior to terminating him.

62.     The Fourteenth Amendment to the United States Constitution provides Mr. Cate procedural due process fairness and protection before he may be deprived of his interest in employment.

63.     As a result of PSEG depriving Mr. Cate of his federal constitutionally protected procedural due process rights, he has suffered lost wages from his premature dismissal from the PSEG/BEC job site and from his inability to find work for approximately two years, despite his civil engineering degree, professional engineering licensure and twenty years of experience managing heavy industrial and civil project work. In addition, Mr. Cate is entitled to attorneys' fees as a result of contesting this wrongful termination.

## COUNT V
## WRONGFUL TERMINATION: VIOLATION OF PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

64.     The allegations of paragraphs 1 through 63 are incorporated herein by reference.

65.     PSEG is a regulated gas and electric company in New Jersey.

66.     In signing his employment contract, Mr. Cate agreed to be bound by the applicable rules, regulations, and policies established by PSEG.

67.     Neither PSEG nor Onsite ever informed or notified Mr. Cate of PSEG's "Zero Tolerance" policy towards sexual harassment or what even constituted sexual harassment.

68.     Nor did PSEG or Onsite ever inform Mr. Cate that he was entitled to a full and fair investigation as a result of being accused of a violation of PSEG's policies.

69.     Even if Mr. Cate had been informed of PSEG's sexual harassment policy, it was certainly not clear from his benign and minimal actions towards Ms. Ross that he was violating the policy to the point that he could be terminated as a result.

70.     The Fourteenth Amendment to the United States Constitution provides Mr. Cate with substantive due process protection before he may be deprived of his interest in employment.

71.     As a consequence of PSEG and Onsite depriving Mr. Cate of his federal constitutionally protected substantive due process rights, he has suffered lost wages from his premature dismissal from the PSEG/BEC job site and from his inability to find work for approximately two years, despite his civil engineering degree, professional engineering licensure and twenty years of experience managing heavy industrial and civil project work. In addition, Mr. Cate is entitled to attorneys' fees as a result of contesting this wrongful termination.

## COUNT VI
## WRONGFUL TERMINATION: VIOLATION OF PLAINTIFF'S RIGHT TO FREE SPEECH UNDER THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION

72.     The allegations of paragraphs 1 through 71 are incorporated herein by reference.

73.     PSEG is a regulated gas and electric company in New Jersey.

74.     By not allowing Mr. Cate the opportunity to defend himself before PSEG terminated him, there is no way that it could have conducted a thorough investigation that could have involved fully evaluating the context and circumstances of Mr. Cate's e-mail to Ms. Ross.

75.     Furthermore, under the circumstances in which Mr. Cate wrote the e-mail, his statements are quite reasonable and do not rise to the level of sexually harassing statements that could have created a hostile work environment for Ms. Ross.

76.     Mr. Cate's non-offensive comments therefore should fall within the arena of speech protected under the First Amendment to the United States Constitution and he should not have been punished as a result of expressing himself the way he did in his e-mail to Ms. Ross.

77.     As a result of PSEG depriving Mr. Cate of his federal constitutionally protected right to free speech, he has suffered lost wages from his premature dismissal from the PSEG/BEC job site and from his inability to find work for approximately two years, despite his civil engineering degree, professional engineering licensure and twenty years of experience managing heavy industrial and civil project work.  In addition, Mr. Cate is entitled to attorneys' fees as a result of contesting this wrongful termination.

### COUNT VII
### WRONGFUL TERMINATION:  VIOLATION OF PLAINTIFF'S PROCEDURAL DUE PROCESS RIGHTS UNDER PART 1, ARTICLE FIFTEEN OF THE NEW HAMPSHIRE STATE CONSTITUTION

78.     The allegations of paragraphs 1 through 77 are incorporated herein by reference.

79.     PSEG has deprived Mr. Cate of his reputation, honor and integrity by not affording him the opportunity to controvert the allegations of sexual harassment against him prior to terminating him.

80.     Part 1, Article 15 of the New Hampshire Constitution provides Mr. Cate procedural due process fairness and protection before he may be deprived of his interest in employment.

81.     As a result of PSEG depriving Mr. Cate of his state constitutionally protected procedural due process rights, he has suffered lost wages from his premature dismissal from the PSEG/BEC job site and from his inability to find work for approximately two years, despite his civil engineering degree, professional engineering licensure and twenty years of experience managing heavy industrial and civil project work.  In addition, Mr. Cate is entitled to attorneys' fees as a result of contesting this wrongful termination.

## COUNT VIII
## WRONGFUL TERMINATION:  VIOLATION OF PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS UNDER PART 1, ARTICLE FIFTEEN OF THE NEW HAMPSHIRE STATE CONSTITUTION

82.     The allegations of paragraphs 1 through 81 are incorporated herein by reference.

83.     In signing his employment contract, Mr. Cate agreed to be bound by the applicable rules, regulations, and policies established by PSEG.

84.     Neither PSEG nor Onsite ever informed or notified Mr. Cate of PSEG's "Zero Tolerance" policy towards sexual harassment or what even constituted sexual harassment.

85.     Nor did PSEG or Onsite ever inform Mr. Cate that he was entitled to a full and fair investigation as a result of being accused of a violation of PSEG's policy.

86.     Even if Mr. Cate had been informed of PSEG's sexual harassment policy, it was certainly not clear from his benign and minimal actions towards Ms. Ross that he was violating the policy to the point that he could be terminated as a result.

87.     Part 1, Article 15 of the New Hampshire Constitution provides Mr. Cate substantive due process protection before he may be deprived of his interest in employment.

15

88.     As a consequence of PSEG and Onsite depriving Mr. Cate of his state constitutionally protected substantive due process rights, he has suffered lost wages from his premature dismissal from the PSEG/BEC job site and from his inability to find work for approximately two years, despite his civil engineering degree, professional engineering licensure and twenty years of experience managing heavy industrial and civil project work.  In addition, Mr. Cate is entitled to attorneys' fees as a result of contesting this wrongful termination.

**COUNT IX**
**WRONGFUL TERMINATION:  VIOLATION OF PLAINTIFF'S RIGHT TO FREE**
**SPEECH UNDER PART 1, ARTICLE TWENTY-TWO OF THE NEW HAMSPHIRE**
**STATE CONSTITUTION**

89.     The allegations of paragraphs 1 through 88 are incorporated herein by reference.

90.     By not allowing Mr. Cate the opportunity to defend himself before PSEG terminated him, there is no way that it could have conducted a thorough investigation that could have involved fully evaluating the context and circumstances of Mr. Cate's e-mail to Ms. Ross.

91.     Furthermore, under the circumstances in which Mr. Cate wrote the e-mail, his statements are quite reasonable and do not rise to the level of sexually harassing statements that could have created a hostile work environment for Ms. Ross.

92.     Part 1, Article 23 of the New Hampshire Constitution guarantees Mr. Cate right to free speech, and not to be disciplined or punished by loss of employment by the lawful exercise of this constitutionally protected right.

93.     Mr. Cate's non-offensive comments therefore should fall within the arena of speech protected under the New Hampshire Constitution and he should not have been punished as a result of expressing himself the way he did in his e-mail to Ms. Ross.

94.     As a result of PSEG depriving Mr. Cate of his constitutionally protected state right to free speech, he has suffered lost wages from his premature dismissal from the

PSEG/BEC job site and from his inability to find work for approximately two years, despite his civil engineering degree, professional engineering licensure and twenty years of experience managing heavy industrial and civil project work.  In addition, Mr. Cate is entitled to attorneys' fees as a result of contesting this wrongful termination.

95.  Plaintiff requests a trial by jury.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

i.  Award Mr. Cate the lost wages he has suffered from his premature and wrongful dismissal from the PSEG/BEC job site and the lost wages he suffered due to his inability to find a job for as a result of the alleged sexual harassment accusation against him;

ii.  Award Mr. Cate reasonable attorneys' fees, costs and interest;

iii.  Grant such other and further relief as may be just and proper.

Respectfully submitted,
BRENDON A. CATE

Dated: 05/26/2006     By: _____, Pro Se

Brendon A. Cate
P.O. Box 444
Plymouth, NH 03264
(603) 536-3508